IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALAN P. WOODRUFF, DANIEL FENTON,
LIBERTARIAN PARTY OF NEW MEXICO,
GREEN PARTY OF NEW MEXICO, and
DONALD HILLIS,

        Plaintiffs,

vs.                                                         Civ. No.  09-449 JH/KBM

MARY HERRERA, in her official capacity
as New Mexico Secretary of State,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This case is before the Court on *Plaintiffs' Motion for Summary Judgment on Count IX* [Doc. No. 95] and *Plaintiff's Motion for Leave to File Amended Complaint and Add Parties* [Doc. Nos. 97 and 117].  Also at issue is a portion of Plaintiffs' motion for summary judgment on Count III-D, a claim which this Court has previously dismissed in part.  However, the Court also asked the parties to submit supplemental briefing on the remaining portion of Count III-D relating to straight-party voting, which the Court will address herein.

After reviewing the briefs and evidence filed by the parties, the Court concludes that the Plaintiffs' motion for leave to amend should be denied, and that Plaintiffs' motion for summary judgment on Count IX should also be denied.

## DISCUSSION

**I.  Motion for Leave to Amend**

Federal Rule of Civil Procedure 15 provides, in regard to motions seeking to amend a

complaint after a responsive pleading has been filed, that such amendments are permitted only with leave of the court and that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A plaintiff's motion to amend his complaint should be granted in the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment. *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)

In this case, the Plaintiffs filed their original Complaint, which contains fifteen separate counts, on May 7, 2009. On June 18, 2009, the Defendant filed her answer to the Complaint, and on August 5, 2009, the United States Magistrate Judge entered a Scheduling Order setting pretrial deadlines and placing the case on a "standard" track. The parties' respective deadlines for disclosing experts were in November, and all discovery was to be completed no later than December 15, 2009. Citing the time-sensitive nature of the candidate qualification requirements at issue in the case, on August 14, 2009, the parties filed a *Joint Motion for Expedited Proceedings* in this matter, and four days later, on August 18, 2009, the Defendant filed her *Motion to Dismiss*. In that motion, Defendant argued that each of Plaintiffs' fifteen claims should be dismissed. Then, on August 25, 2009, Plaintiffs responded to the motion to dismiss and filed the first of their many motions for summary judgment on their respective claims. Plaintiffs continued to file motions for summary judgment on most of their claims until early December, culminating in *Plaintiffs' Motion for Summary Judgment on Counts V and VI* [Doc. No. 100].

In the meantime, on September 1, 2009, Plaintiffs filed a motion for extension of time in which to file their amended complaint [Doc. No. 32], and on the following day this case was reassigned to the undersigned United States District Judge. On September 14, 2009, the Court

granted the Plaintiffs' motion for extension of time to amend [Doc. No. 48]. However, Plaintiffs did not amend their complaint at that time. Instead, they proceeded to continue filing their many motions for summary judgment, and they also filed another motion for expedited treatment on December 3, 2009. [Doc. No. 97]. By December 4, 2009, Plaintiffs had filed eleven separate motions for summary judgment on twelve of their fifteen claims, all while pressing the Court to expedite its rulings in this case. Despite its heavy criminal caseload, the Court did so, spending a great deal of time and resources in reviewing the hundreds of pages of briefing and exhibits offered in support of both Defendant's motion to dismiss and Plaintiffs' numerous motions for summary judgment. On December 8 and December 11, 2009, the Court issued Memorandum Opinions and Orders addressing most of those motions. However, on December 3, 2009, after the parties had already spent a great deal of time and money briefing dispositive motions, and after the Court had expended a large amount of time in preparing its written rulings, Plaintiffs again moved for leave to file an amended complaint. [Doc. No. 97]. Plaintiffs renewed that motion on December 30, 2009 [Doc. No. 117].

One of the justifications for denying a motion to amend is undue delay. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 (10th Cir. 2006). "The longer the delay, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." *Id*. at 1205 (quotation omitted). The court appropriately may deny leave to amend "when the party filing the motion has no adequate explanation for the delay." *Id*. at 1206 (quotation omitted). In their motions for leave to amend, Plaintiffs provided no explanation as to why they failed to amend their complaint several months earlier, in September of 2009, when they requested and received permission to do so. Second, they also failed to explain why they had repeatedly urged the Court

3

to expedite its ruling on the pending dispositive motions (which, of course, addressed the original complaint) while simultaneously asking the Court for permission to amend the complaint to add parties, add claims, and correct deficiencies, effectively starting the case at the beginning.  Third, Plaintiffs' argument, in their December 3, 2009 motion to amend [Doc. No. 97], that " the court has not yet addressed any of the issues presented in this case," is unpersuasive because as of that date and at the urging of the Plaintiffs, the Court had completed its analysis of the pending motions and had nearly finished preparing its written rulings.  Similarly, by that point the parties had expended tremendous resources in briefing those motions.  Fourth, Plaintiffs assert that recent federal court decisions afford them new causes of action not previously available, and that discovery has revealed facts not previously available to them.  However, in their motions to amend [Doc. Nos. 97 and 117] Plaintiffs have not set forth any specific facts in support of these statements.  Similarly, Plaintiffs have not explained why the proposed new parties, Reform Party of New Mexico, La Raza Unida, and New Mexico Libertarian Party, have not attempted to join the litigation prior to this point.

     Based on the foregoing, the Court concludes that it should deny Plaintiffs' motions for leave to amend their complaint for two reasons.  First, the request is the result of undue delay by the Plaintiffs. Plaintiffs filed their motions for leave to amend approximately seven and eight months, respectively, after they filed their original complaint and after they filed eleven motions for summary judgment.  The Plaintiffs urged the Court to expedite its rulings on the motions, which it did.  Despite having a busy docket of cases with pending motions that were filed before the motions in this case, at the request of both parties the Court put this case at the "front of the line," and accordingly has ruled on the motion to dismiss and on all but one of Plaintiffs' motions for summary judgment.  Nowhere do Plaintiffs explain why they spent so much of their time and energy on their motions for summary judgment (forcing Defendant and the Court to do the same), while pressing

for a disposition on all of their claims, only to immediately turn around and ask the Court to allow them to file an entirely new complaint. Second, granting the request would result in unfair prejudice to the Defendant, who would in essence be forced to litigate this case from the beginning after responding to the eleven motions for summary judgment that Plaintiffs not only filed, but also pressed for expedited ruling.

Thus, the motions for leave to amend will be denied.

## II.     Motion for Summary Judgment on Count IX

In Count IX of the Complaint, Plaintiffs allege that Section 1-7-2 of the Election Code, which provides for de-qualification of political parties that either do not run candidates for two successive general elections or "if the total votes cast for the party's candidates for governor or president of the United States . . . do not equal at least one-half of one percent of the total votes cast for the office of governor or president of the United States . . ." is unconstitutional. Section 1-7-2, which also states that voters who are registered members of a de-qualified party will be notified of its de-qualification, applies equally to all political parties. It further provides that parties decertified in this manner may requalify by complying with the filing requirements for political parties. In the Complaint, Plaintiffs allege that the foregoing provisions of the Election Code impair the ability of minor parties to expand. They also allege that in the 2008 general election, the ballot offered a "straight party" voting option only for the Republican and Democratic parties, omitting the Green and Libertarian parties from that option, which impaired their ability to attract votes. This latter allegation is virtually identical to the allegations concerning straight party voting in Count III-D of the Complaint, regarding which the Court requested the parties submit additional briefing.

In its Memorandum Opinion and Order entered December 8, 2009 [Doc. No. 103], the Court dismissed Count IX to the extent that it asked the Court to declare that both Sections 1-7-2(C) and

(D) of the Election Code are unconstitutional because the Plaintiffs failed to allege what aspect of the constitution those provisions violate. As such, the Court was unable to evaluate whether Plaintiffs had stated a claim for a constitutional violation. Therefore, with the exception of their claim that straight party voting is unconstitutional, the remainder of Plaintiffs' Motion for Summary Judgment on Count IX [Doc. No. 95] is now moot and should be denied as such.[1] Because the Court cannot distinguish Plaintiffs' Count IX claim regarding straight party voting from the identical claim in Count III-D, the Court will address the issue in the context of the additional briefing the parties have filed regarding Count III-D.

### III. Plaintiffs' Request for Summary Judgment On Their Claim That Straight Party Voting is Unconstitutional (Counts III-D and IX)[2]

This Court denied Defendant's motion to dismiss Count III-D of Plaintiffs' Complaint, finding that Plaintiffs had alleged enough to state a claim for relief. *See* Doc. No. 103 at 17-18. However, in its December 11, 2009 Memorandum Opinion and Order [Doc. No. 106 at 7] addressing the Plaintiffs' motion for summary judgment on Count III-D, the Court asked the parties

---

[1] A review of Plaintiffs' Motion for Summary Judgment on Count IX reveals that Plaintiffs now rely and seek summary judgment upon legal theories not hinted at, much less properly pled, in Count IX of their Complaint. For example, in their motion for summary judgment [Doc. No. 95] Plaintiffs claim for the first time that the Secretary of State has failed to properly interpret § 1-7-2(C), that the conditions predicate for decertifying the Green Party were not satisfied, and that the Secretary of State has applied the statute in an inconsistent manner. They also assert for the first time that the statute violates their rights to equal protection, free association, substantive due process, and procedural due process. Thus, even if the motion for summary judgment were not moot as a result of the Court's ruling on the Defendant's motion to dismiss, the Court would still have denied Plaintiffs' motion for summary judgment on the grounds that they were requesting the Court to enter summary judgment on claims not pled in the Complaint.

[2] The Court cannot distinguish between Plaintiffs' claims in Count III-D and Count IX insofar as they relate to straight party voting. Accordingly, the Court treats them as one in the same.

for supplemental briefing regarding the appropriate constitutional standard for evaluating Plaintiffs' claim that Defendant's practice of permitting straight party voting violates their right to equal protection. On December 21, 2009, the parties filed their supplemental briefs, which the Court has reviewed.

### 1. *Standard of Review*

The first issue before the Court is to determine the standard under which it must evaluate Plaintiffs' claim that Defendant's practice allowing straight party voting violates their right to equal protection. When a classification targets a suspect class or involves a fundamental right, the Court must apply strict scrutiny. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). To survive strict scrutiny, the government must show that its classification is narrowly tailored to achieve a compelling government interest. *See id.* In addition, there is an intermediate scrutiny which applies, for example, to gender-based classifications. *See Concrete Works of Colo., Inc. v. City and County of Denver*, 321 F.3d 950, 959 (10th Cir. 2003). Such classifications will survive an equal protection challenge if there is "an 'exceedingly persuasive justification' for those measures;" that is, if the government can show that the challenged classification serves an important governmental interest and is substantially related to achieving those objective. *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 524 (1996)). Finally, if a classification does not target a suspect class, involve a fundamental right, or implicate intermediate scrutiny, then "the statute need only be rationally related to a legitimate government purpose." *Todd*, 279 F.3d at 1210.

On the other hand, in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), the Supreme Court held that courts resolving constitutional challenges to a State's election laws must apply a balancing test. Specifically, a court

> must first consider the character and magnitude of the asserted injury to the rights

> protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* In *Anderson*, the Court based its conclusions directly on the First and Fourteenth Amendments and did not engage in a separate Equal Protection Clause analysis, though it acknowledged its reliance upon decisions applying the "fundamental rights" equal protection framework. *Id.* at 786 n.7.

Plaintiffs argue that the Court should apply strict scrutiny to New Mexico's straight party voting procedure because it implicates fundamental rights. On the other hand, the Defendant asks the Court to apply the *Anderson* balancing test. After reviewing the *Anderson* decision and its progeny, the Court agrees with Defendant that it should apply the *Anderson* balancing test. The Court notes that in later election cases, the Supreme Court has followed *Anderson*'s balancing approach. For example, in *Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008), the Court held that Indiana's interests in requiring voters to show a government-issued photo identification were sufficiently weighty to justify any limitation imposed on voters. In *Norman v. Reed*, 502 U.S. 279, 288-289 (1992), after identifying the burden Illinois imposed on a political party's access to the ballot, the Court "called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation," and concluded that the "severe restriction" was not justified by a narrowly drawn state interest of compelling importance. Later, in *Burdick v. Takushi*, 504 U.S. 428 (1992), the Court applied *Anderson*'s standard for "'reasonable, nondiscriminatory restrictions,'" *id.* at 434, and upheld Hawaii's prohibition on write-in voting despite the fact that it prevented a significant number of "voters from participating in Hawaii elections in a meaningful manner." *Id.* at 443

(Kennedy, J., dissenting).  The Court reserved strict scrutiny for laws that severely restrict the right to vote, *id*. at 433-434, and reaffirmed *Anderson*'s requirement that a court evaluating a constitutional challenge to an election regulation weigh the asserted injury to the right to vote against the "'precise interests put forward by the State as justifications for the burden imposed by its rule.'"  504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).  The *Burdick* court recognized that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently."  *Id*. at 433.

In this case, the Court cannot conclude that straight party voting, even when it applies to major parties but not minor parties or independents, is a "severe" restriction on the right to vote.  With only slightly more effort, voters can still vote for minor party and independent candidates—they merely must cast such votes individually rather than as a straight party vote.  *See also McDonald v. Grand Traverse County Election Comm'n*, 662 N.W.2d 804, 812-13 (Mich. Ct. App. 2003).[3]  Thus, the Court finds that the *Anderson* balancing test is appropriate here.  Next, in light of the *Anderson* standard, the Court must determine whether no genuine issue of material fact

---

[3] In *McDonald*, the court reasoned: "We conclude that the straight-ticket ballot option places only a "lesser burden" as opposed to a "severe burden" on McDonald's associational rights.  The essence of each of the benefits of the straight-ticket ballot option that McDonald claims he was denied as a result of his independent status concerns the ease with which voters could cast their vote for him.  As a result of McDonald's decision not to associate with a political party, voters who wanted to vote for him for township trustee were required to spend more time and make a greater effort to vote for him than voters who simply voted straight-ticket.  However, even straight-ticket voters were not prohibited from splitting their ticket and voting for a candidate of another party or an independent candidate for any of the partisan offices.  Because the straight-party ballot option did not prevent or prohibit straight-ticket voters from splitting their tickets and voting for McDonald and because any voter who desired to vote for McDonald could do so if the voter took the time and made the effort, we conclude that the nature of the burden on McDonald's associational rights was not severe enough to warrant strict-scrutiny review."  662 N.W.2d at 812-13.

exists such that Plaintiffs are entitled to summary judgment on their claim.

### 2.     *The Burden on Plaintiffs' Fourteenth Amendment Rights*

Plaintiffs complain that only "Republican" and "Democrat" were listed as straight party voting options on the 2008 general election ballot, and neither "Libertarian" nor "Green" were identified as one of the straight party options. Plaintiffs argue that in doing so, New Mexico has promoted, endorsed, and publicized the two major parties above all others. *See* Doc. No. 95 at 16. They claim that this creates a bias against minor parties, reduces the number of votes they get, and "inherently reduces the chances of a minority party candidate receiving sufficient votes to enable the party to retain its status as a 'qualified party.'" *Id*. at 16-17. *See also* Doc. No. 44 at 6-7 ("[T]he failure of the New Mexico ballot to even identify other parties as having candidates on the ballot implies that no other parties have candidates on the ballot and <u>discourages</u> any effort to locate and vote for any candidate who is not a member of the parties identified in the 'Straight-Party' voting options.") (emphasis in original).

### 3.     *The State's Interests*

Defendant contends that straight party voting promotes the "quick and orderly administration of elections and allowing voters options in completing their ballots." Doc. No. 95, Ex. F at 15. *See also* Doc. No. 65 at 4 n.2 ("Straight party voting is also justified by the State's interest in running an orderly election. Plaintiffs would like to force those voters who would otherwise choose to vote a straight party ticket to instead vote on each election individually. This would not change the candidates selected; it would only add to the investment of time that voter must make in voting. Generally speaking, the State is justified in making it easier, rather than harder, to vote."). Defendant offers evidence that in the 2008 general election, six parties (Republican, Democrat, Green, Constitution, Independent, and Libertarian) ran candidates for the office of the President of

the United States. However, of those four minor parties, only two offered candidates for offices other than President. Doc. No. 102 at 23, and exhibits thereto. Specifically, the Independent Party had a candidate for State Representative, and the Green Party ran a candidate for the New Mexico Public Regulation Commission. *Id*. There were 148 offices on the 2008 general election ballot. Defendant contends that with each minor party having only one or two candidates on the entire ballot consisting of 148 races, a straight party vote for a minor party will leave the ballot with a significant "undercount," in that the voter will not place a vote in most of the offices, and an undercount of that magnitude raises questions about the ballot cast.

The interests that Defendant articulates are "important regulatory interests" under *Anderson*. In *Timmons v. Twin Cities Area New Party*, the United States Supreme Court recognized that a state "certainly ha[s] an interest in protecting the integrity, fairness, and efficiency of [its] ballots and election processes as means for electing public officials." 520 U.S. 351, 364 (1997) (upholding the constitutionality of Minnesota's "antifusion" laws prohibiting candidates from appearing on ballot as candidate of more than one political party). The United States Supreme Court also recognized in *Timmons* that a state also has a "strong interest" in the stability of its political systems. *Id*. at 366.

### 4. *Balancing the Respective Interests*

The final step of the *Anderson* test requires this Court to balance the character and magnitude of the constitutional injury to Plaintiffs against the State's interests. The Court concludes that the State's interest in the quick and orderly administration of elections and the strong interest in the stability of its political systems outweigh the burden on Plaintiffs' Fourteenth Amendment rights. States must be permitted to enact reasonable regulations of parties, elections, and ballots to reduce disorder in the campaign and election process. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). " '[A]s a practical matter, there must be a substantial regulation of elections if

they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.' " *Burdick*, 504 U.S. at 433. Moreover, the State's interest in the stability of its political systems permits it "to enact reasonable election regulations that may, in practice, favor the traditional two-party system." *Timmons*, 520 U.S. at 367. "[W]hile an interest in securing the perceived benefits of a stable two-party system will not justify unreasonably exclusionary restrictions, . . . [s]tates need not remove all of the many hurdles third parties face in the American political arena today." *Id*. In contrast, the burden placed on any voter wishing to vote for a minor party candidate is relative light—that voter must merely find the portion of the ballot listing the office for in which the minor party candidate is running, and vote for that person. *See also Graves v. McElderry*, 946 F.Supp. 1569, 1581 (W.D. Okla. 1996) (finding Oklahoma's straight party voting system to be constitutional under *Anderson* balancing test). *Cf. Orr v. Edgar*, 698 N.E.2d 560, 564-65 (Ill. Ct. App. 1998) (concluding that Illinois legislation abolishing straight-party voting does not infringe upon the right to vote, but rather affects the manner in which citizens exercise their right to vote. "The Act does not prohibit voters from voting a straight-party ballot. Indeed, an individual voter still has the right to cast a ballot entirely for candidates of one political party. The Act only dictates the manner in which the voter may select candidates.").

Thus, on the record currently before the Court, the *Anderson* balancing test weighs in favor of Defendant, and Plaintiffs' motion for summary judgment on its claim in Count III-D and Count IX that New Mexico's straight-party voting scheme is unconstitutional will be denied.

**IT IS THEREFORE ORDERED** that:

(1) *Plaintiffs' Motion for Summary Judgment on Count IX* [Doc. No. 95] is **DENIED**;

(2) *Plaintiff's Motion for Leave to File Amended Complaint and Add Parties* [Doc. Nos. 97 and 117] is **DENIED**;

(3)  Plaintiffs' request for summary judgment on its claim that New Mexico's straight party voting scheme is unconstitutional (Counts III-D and IX) is **DENIED**; and

(4)  Having previously dismissed Plaintiffs' claims in Counts V and VI with prejudice in a Memorandum Opinion and Order entered December 8, 2009, the Court finds that *Plaintiffs' Motion for Summary Judgment on Counts V and VI* [Doc. No. 100], as well as their motion to file excess pages in support of that motion [Doc. No. 99] are both **MOOT**.

_____
**UNITED STATES DISTRICT JUDGE**